## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| BETZABEL BANDA-MARTINEZ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:24-cv-391 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| LUIS CURIEL, in his individual capacity, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, BETZABEL BANDA-MARTINEZ, Plaintiff, files this Original Complaint, complaining of Defendants UNITED STATES OF AMERICA and LUIS CURIEL, in his individual capacity, and for causes of action will respectfully show unto the Court as follows:

> "Our findings are deeply disturbing and demonstrate, in my view, that the BOP is failing systemically to prevent, detect, and address sexual abuse of prisoners by its own employees."
>
> Sen. Jon Ossoff, D-Ga., subcommittee chairman.

1

## SUMMARY

In April of 2022, the Permanent Subcommittee on Investigations ("PSI" or "the Subcommittee") launched a bipartisan investigation into the sexual abuse of female prisoners in the custody of the Federal Bureau of Prisons ("BOP"). The Subcommittee found that BOP employees sexually abused female inmates in at least two-thirds (19 of 29) facilities of federal prisons that have held women over the past decade. In 2003, Congress passed PREA to "eradicate prisoner rape in all types of correctional facilities in this country" by requiring federal prisons to adopt certain policies and practices designed to mitigate the risk of sexual abuse, track allegations of sexual abuse, and protect potential victims." Sen. Jon Ossoff, D-Ga., subcommittee chairman, said at a hearing, "Our findings are deeply disturbing and demonstrate, in my view, that the BOP is failing systemically to prevent, detect, and address sexual abuse of prisoners by its own employees."

In October 2021, Plaintiff, Betzabel Banda-Martinez, was an inmate assigned to the BOP Carswell Federal Medical Center (Carswell) in Fort Worth, Texas. During her incarceration at FMC Carswell, Ms. Banda-Martinez was repeatedly victimized due to the terrifying culture of rape and sexual abuse in the facility. In and during the months of June to October 2021, within the boundaries of Carswell Medical Center, Luis Curiel knowingly engaged in sexual act(s) with Ms. Banda-Martinez while she was in official detention and under the authority of Curiel, a Federal Correctional Officer. Specifically, on or about October 16, 2021, while on duty at FMC Carswell, Curiel met with Ms. Banda-Martinez by a staff elevator, penetrated her with his penis, and stuck his fingers up her vagina causing her to painfully bleed. Ms. Banda-Martinez was taken to John Peter Smith Hospital where a rape kit was conducted.

Ms. Banda-Martinez suffered mental anguish and physical damages as a result of the sexual abuse she endured. Curiel exerted his abuse of power by threatening Ms. Banda-Martinez with time in the Special Housing Unit if she did not obey him. Special Housing Units (SHUs), also known as "the hole," are how the Federal Bureau of Prison segregates prisoners. In November of 2021, Ms. Banda-Martinez was transferred to FCI Aliceville for her own safety due to the sexual assault perpetrated by Curiel.

Curiel admitted to what happened and eventually plead guilty to Sexual Abuse of a Ward in violation of 18 U.S.C. § 2243(b). Shockingly, Curiel's abuse of power did not stop with the heinous sexual acts he committed against Ms. Banda-Martinez. Curiel also plead guilty to the sexual assault of inmate M.C. and inmate N.R. Like Ms. Banda-Martinez these were two female detainees also under the authority of Curiel. In October, Curiel met N.R. by the staff elevators at FMC Carswell and after kissing her neck, put his hand inside her pants and underwear and digitally penetrated N.R.'s vagina. On or about October 9, 2021, Curiel met M.C. by the staff elevator at FMC Carswell and engaged in sexual intercourse with M.C. All of the sexual assaults took place near the staff elevator or the stairwell next to the elevator, both of which are within the boundaries of FMC Carswell.

Curiel was sentenced to eighteen (18) months in federal prison, two (2) years of supervised release, and a special assessment of $200. He has a Federal Register Number of 01501-510. The criminal case associated with Curiel is 4:22-CR-132-P in the Northern District of Texas Fort Worth Division.

BOP knew that Curiel posed a danger to female inmates. On July 12, 2021, DOJ-OIG received information regarding an allegation of an inappropriate relationship between Curiel and female inmates. Specifically, a staff member reported Defendant Curiel to administrators and told

the Star-Telegram that she was subsequently retaliated against and fired. The staff member said she reported Curiel to supervisors the summer of 2021. Yet, Curiel worked at the facility—and assaulted multiple women—after the reports were filed. The staff member informed the Star-Telegram that she never got a response to her initial report about Defendant Curiel. This means that despite having received information regarding allegations of inappropriate relationships between Curiel and female inmates Curiel was given access to vulnerable inmates such as Ms. Banda-Martinez.

On October 19, 2021, Ms. Banda-Martinez was interviewed and detailed her sexual relationship with Curiel. On October 20, 2021, each of the additional victims were interviewed and provided details of Curiel's predatory behavior. On October 19, 2021, Luis Curiel submitted to a voluntary interview with DOJ-OIG officials.  He also admitted using email to communicate with Ms. Banda-Martinez and providing gifts to her. Defendant Curiel used Corrlinks, software used by BOP for inmates to communicate with family members, to communicate with Ms. Banda Martinez. Luis Curiel was placed on administrative leave on October 19, 2021.

Ms. Banda-Martinez now sues Defendant Curiel for the repeated batteries he committed against her without consent or lawful authority, by performing sexual acts, and raping her in violation of the torts of assault and battery under the laws of the state of Texas. Ms. Banda-Martinez also sues Defendant United States of America for breaching its legal duty to Plaintiff, an inmate in its care and custody, by negligently retaining Ms. Banda-Martinez's rapist, Defendant Curiel, and fostering a terrifying culture of rape and sexual abuse at FMC Carswell.

## I.
## PARTIES

1.      At all times material hereto, Plaintiff Betzabel Banda Martinez was a federal prisoner confined in FMC Carswell in Fort Worth, Texas, which facility is within the Northern District of Texas.[1]

2.      At all times material hereto, Defendant United States of America owned and operated a correctional facility known as FMC Carswell and were the employers of Defendant Curiel. Defendant United States of America can be served by delivering a copy of the summons and of the complaint to the United States Attorney for the Northern District of Texas and by sending a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C.

3.      At all times material hereto, Defendant Luis Curiel was a correctional officer at FMC Carswell, which facility is within the Northern District of Texas. Defendant Curiel acted within the course and scope of his employment. Defendant Curiel is being sued in his individual capacity and can be served by serving the United States and by serving Defendant Curiel wherever he may be found.

## II.
## JURISDICTION AND VENUE

4.      The Court has original jurisdiction over this action under 28 U.S.C. § 1331 and § 1346, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1972), and 28 U.S.C. § 2671, et. seq., Federal Tort Claims Act.

5.      Plaintiff filed claims under the Federal Tort Claims Act, which were received by the Federal Bureau of Prisons for processing on October 11, 2023.[2]

---

[1] Plaintiff has been released from federal custody.
[2] See the SF-95 forms attached as Exhibit A and incorporated into this pleading in its entirety.

6.     The claims were denied on November 7, 2023.

7.     Plaintiff has exhausted her administrative remedies and obtained the relief that the administrative remedies could afford.

8.     Plaintiff has otherwise performed all acts precedent to bringing this suit or such acts have been waived.

9.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1331 because at least one of the Defendants is domiciled and/or resides in the Northern District of Texas, and all or a substantial part of the cause of action occurred in the Northern District of Texas.

**III.**
**FACTS AND ALLEGATIONS**

10.     During the year 2021, Plaintiff Betzabel Banda-Martinez was an inmate at FMC Carswell, a federal correctional facility, under the care and custody of that facility and was a person to whom Defendants owed a duty of care.

11.     In September 2020, Defendant Luis Curiel was employed as a lieutenant at FMC Carswell.

12.     Correctional officers have vast power and control over the stay of inmates under their watch and are responsible for supervising inmates and inmate activity in detention facilities.

13.     FMC Carswell is a facility with both an administrative security medical center and a minimum-security satellite camp.

14.     In and during the months of June through October 2021, within the boundaries of Carswell Medical Center, Luis Curiel knowingly engaged in sexual act(s) with Ms. Banda-Martinez while she was in official detention and under the authority of Curiel, a Federal Correctional Officer.

15.     Defendant Curiel threatened Ms. Banda-Martinez that if she didn't obey his orders, he would be able to call her family and he would place her in the Special Housing Unit.

16.     Special Housing Units (SHUs), also known as "the hole," are how the Federal Bureau of Prison segregates prisoners.

17.     Ms. Banda-Martinez was afraid of Defendant Curiel since he knew intimate details about her life by listening to all of her phone calls and reading her emails.

18.     Defendant Curiel used Corrlinks, software used by BOP for inmates to communicate with family members, to communicate with Ms. Banda Martinez.

19.     Defendant Curiel provided gifts to Ms. Banda-Martinez.

20.     On one particular occasion, Defendant Curiel went to the home where Ms. Banda-Martinez's mother and children resided and made arrangements to buy Ms. Banda-Martinez a pre-paid phone in order to communicate with him.

21.     Defendant Curiel's actions of buying Ms. Banda-Martinez gifts, reading and listening to her communications with her loved ones, and threatening to place her in the SHU were all measures used to prey on Mr. Banda-Martinez and exert power and control over her.

**Defendant Curiel Sexually Assaults Ms. Banda Martinez**

22.     On or about October 16, 2021, while on duty at FMC Carswell, Curiel met with Ms. Banda-Martinez by a staff elevator and penetrated her with his penis and stuck his fingers up her vagina causing her to painfully bleed.

23.     Upon information and belief, the staff elevator is near a camera blind spot within FMC Carswell and staff members utilize this area of the facility as a location to victimize female inmates.

24.     On October 16, 2021, Ms. Banda-Martinez was walking to her unit from lunch.

25.    Ms. Banda-Martinez noticed Defendant Curiel standing by the staff elevator.

26.    Ms. Banda-Martinez tried to take the stairs to get away from Defendant Curiel.

27.    Defendant Curiel told Ms. Banda-Martinez to come here and warned that if she didn't come to him, he would place her in the Special Housing Unit.

28.    Curiel exerted his abuse of power by threatening Ms. Banda with time in the Special Housing Unit if she did not obey him.

29.    Defendant Curiel roughly grabbed Ms. Banda-Martinez's arm.

30.    Ms. Banda-Martinez begged for Defendant Curiel to let her go.

31.    Defendant Curiel kissed Ms. Banda-Martinez and bit her on her breasts during the sexual assault.

32.    Defendant Curiel pulled his pants down.

33.    Defendant Curiel penetrated Ms. Banda-Martinez in her vagina and told her that they were going to be together.

34.    A sound came over Defendant Curiel's radio and he stopped the sexual assault.

35.    The only reason why Defendant Curiel left the scene of the assault was that a sound came over his radio and interrupted him.

36.    After the completion of the sexual assault committed against her, Ms. Banda-Martinez went to her housing unit in shock and took a shower.

37.    A few days later, on October 20, 2021, Defendant Curiel saw Ms. Banda-Martinez in the kitchen area and told her to come to him.

38.    Defendant Curiel threw a chair trying to get Ms. Banda-Martinez's attention.

39.    Ms. Banda-Martinez ran away scared from Defendant Curiel.

40.    On October 21, 2021, the Unit team pulled Ms. Banda-Martinez out of her cell.

41.   Ms. Banda-Martinez was informed she was going somewhere.

42.   The Unit team walked Ms. Banda-Martinez to the Warden's Office.

43.   A female SIA, a U.S. Marshall, and Warden Michael Carr were present.

44.   The SIA, U.S. Marshall, and Warden Carr told Ms. Banda-Martinez that they already knew what was going on referring to the sexual assault Defendant Curiel committed agaisnt her.

45.   Ms. Banda-Martinez was taken to John Peter Smith Hospital where a rape kit was conducted.

46.   In November of 2021, Ms. Banda-Martinez was transferred to FCI Aliceville for her own safety due to the sexual assault perpetrated by Curiel.

47.   After his conviction, Defendant Curiel continued his predatory conduct by reaching out to Ms. Banda-Martinez on Facebook.

48.   Defendant Curiel sent Ms. Banda-Martinez a link to an intimate song.

49.   Below is a screen capture of the Facebook message.



**FMC Carswell Knew Defendant Curiel Posed a Danger to inmates**

50.    BOP employees at FMC Carswell knew about the predatory environment at FMC Carswell long before Ms. Banda-Martinez was sexually assaulted by Defendant Curiel on October 16, 2021.

51.    In April 2021, a staff member reported to staff member Lieutenant Simpson that inmate Sandra Shoulders told her that officers were bringing in contraband to inmates and assaulting inmates.

52.    The contraband included perfume and cell phones.

53.    The staff member sent an internal email to SIS.

54.    SIS never responded to that email.

55.    The investigation uncovered that Officer Nicks, who worked in the recreation unit, was sexually assaulting inmates.

56.    SIS Malone investigated and found semen on a chair in the area that Nicks worked.

57.    The inmate that was sexually assaulted by Nicks ended up contracting gonorrhea.

58.    This confirmed sexual assault by Officer Nicks should have put BOP on alert that accusations should be treated as credible and given due consideration and investigation.

59.    Then, on July 12, 2021, the Department of Justice Office of Inspector General's Office received information regarding an allegation of an inappropriate relationship between Curiel and female inmates.

60.    Speifically, a staff member reported that she witnessed an inmate inappropriately caressing Curiel in a sexual manner on his chest and shoulders as well as squeezing the muscles on his arm.

61. The staff member observed this when she, Curiel, and Lieutenant Ricardo were responding to a medical emergency.

62. The staff member first reported what she observed to Lieutenant Anthony.

63. Lieutenant Anthony asked the staff member if anyone else saw this occur and if Curiel said anything to her.

64. Lieutenant Anthony told the staff member to leave the situation alone and not tell anybody.

65. DOJ-OIG agents investigated the allegations and determined that during the spring, summer, and fall of 2021, Curiel engaged in a sexual relationship with Ms. Banda-Martinez.

66. Specifically, a staff member reported Defendant Curiel to administrators and told the Star-Telegram that she was subsequently retaliated against and fired.

67. The staff member said she reported Curiel to supervisors the summer of 2021. Yet, Curiel worked at the facility—and assaulted multiple women—after the reports were filed.

68. The staff member informed the Star-Telegram that she never got a response to her initial report about Defendant Curiel.

69. This means that despite having received information regarding allegations of inappropriate relationships between Curiel and female inmates, Curiel was given access to vulnerable inmates such as Ms. Banda-Martinez and provided the opportunity to sexually assault.

70. Shockingly, this is not the first time a staff member at FMC Carswell has preyed on female inmates.

71. FMC Carswell has had multiple incidents with male staff sexually assaulting female inmates.

a. On 3/6/2024, Marerllis Nix, a former correctional recreation specialist at Carswell, was sued in the Northern District of Texas for exploiting his position to sexually abuse women who were incarcerated at FMC Carswell in the custody of BOP. According to the lawsuit, "Nix was permitted to take incarcerated women to areas of the prison without surveillance cameras, such as his office in the recreation area, without corrections officers and his supervisors intervening."

b. On 9/6/2017, Matthew McGaugh, a case manager at FMC Carswell, was sentenced to twelve months in federal prison following his guilty plea in July 2017 to Sexual Abuse of a Ward.

c. On 6/7/16, Yvonne Marrufo, a cook at FMC Carswell, plead guilty to Sexual Abuse of a Ward.

d. On 7/7/14, Brady Michael Green pleaded guilty to Providing a False Statement. According to his Factual Resume, he knowingly and willfully made a false statement by claiming to the Office of the Inspector General that he had sexual intercourse on one occasion with a female inmate of the BOP when the defendant then and there knew he had sexual intercourse with the inmate on more than one occasion.

e. On 11/14/07, Vincent Inametti, a chaplain at FMC Carswell, plead guilty to two counts of Sex Abuse of an Adult Ward in Custody. According to his Factual Resume, Mr. Inametti directed an inmate to the chapel library, where he engaged in a sexual act with that inmate. Mr. Inametti then summoned another inmate to a classroom in the chapel, where he engaged in a sexual act with that inmate.

f. On 2/10/04, a jury found Michael Miller, a guard at FMC Carswell, guilty of one count of Aggravated Sexual Abuse, one count of Sexual Abuse of a Ward, and two counts of Abusive Sexual Contact.

g. On 7/02/03, Dr. Carlos Baez, a staff obstetrician-gynecologist at FMC Carswell, plead guilty to Sexual Abuse of a Ward for having sexual intercourse with three prisoners.

h. On 5/7/99, Steven Suarez plead guilty to Sex Act with a Person Under Peripheral Supervision. According to the Order denying Defendant United States of America's Motion for Summary Judgement, prior to the final assault where Mr. Suarez forced the inmate to perform oral sex on him, the inmate had several private meetings with Mr. Suarez. In these private meetings, Mr. Suarez fondled her breasts, kissed and hugged her, and placed his hand on her vagina.

i. On 4/2/99, Larry Alex, a Kitchen Supervisor at FMC Carswell, plead guilty to Sexual Abuse of a Ward.

j. On 1/21/98, Gregory Morganfield, a guard at FMC Carswell, plead guilty to Sex Act with Prisoner by a Prison Guard.

k. On 5/14/97, Daryl Desjardin, a supervisory chaplain at FMC Carswell, plead guilty to Sex Act with Person Under Peripheral Supervision.

72. Based off of the numerous prior confirmed sexual assaults by staff on inmates, BOP officials should have known better than to retain Defendant Curiel after receiving numerous inappropriate allegations made against him.

73. Including Ms. Banda-Martinez's sexual assault, there were at least eleven known convictions of FMC Carswell staff for sexual assaults on inmates. This number is shocking,

14

unacceptable, and should have caused BOP officials to take action to prevent the ongoing sexual assaults by FMC Carswell staff long before Defendant Curiel abused Ms. Banda-Martinez.

74.    Based off the numerous prior sexual assaults by staff on inmates, BOP officials should have implemented a better screening and hiring process so that these sexual assaults stopped occurring.

75.    Based off the numerous prior sexual assaults by staff on inmates, BOP officials should have implemented a better training program so that these sexual assaults stopped occurring.

**The Culture of Sexual Violence Against Female Inmates in BOP is Wide-Spread**

76.    On July 14, 2022, Deputy Attorney General Lisa O. Monaco issued a memorandum identifying deep concerns about instances of reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees.

77.    The memorandum directed the Principal Associate Deputy Attorney General to chair a group of senior officials the ("Working Group") to review the Department of Justice's response to allegations of sexual misconduct perpetrated by BOP personnel and identifying recommendations to improve that approach.

78.    The Working Group recommended the following actions: (1) BOP should enhance prevention of sexual misconduct perpetrated by BOP staff; (2) BOP should enhance reporting of BOP staff who commit sexual misconduct; (3) DOJ should enhance and prioritize investigations of BOP staff who are accused of sexual misconduct; and (4) DOJ should enhance and prioritize prosecutions of BOP employees who commit sexual misconduct; and (5) BOP should enhance the use of administrative actions and discipline of BOP employees who commit sexual misconduct.

79.    In addressing the first recommendation, the Commission said BOP should increase camera technology and coverage and consider leveraging the insights of formerly incarcerated persons in assessing the safety of its facilities.

**Defendant Curiel was Convicted of Sexual Abuse with a Ward**

80.    Curiel admitted to what happened to Ms. Banda Martinex and eventually pleaded guilty to Sexual Abuse of a Ward in violation of 18 U.S.C. Section 2243(b).

81.    In order to establish the offense of Sexual Abuse of Ward, it must be proved beyond a reasonable doubt that: (1) the defendant knowingly engaged in a sexual act with a ward; (2) at the time the ward was in official detention at a federal prison; (3) the ward was under the custodial, supervisory or disciplinary authority of the defendant; and (4) the offense was committed within the boundaries of a federal prison.

82.    Shockingly, Curiel's abuse of power did not stop with the heinous sexual acts he committed against Ms. Banda- Martinez.

83.    Curiel also plead guilty to the sexual assault of inmate M.C. and inmate N.R.

84.    Like Ms. Banda-Martinez these were two female detainees also under the authority of Curiel.

85.    In October, Curiel met N.R. by the staff elevators at FMC Carswell and after kissing her neck, put his hand inside her pants and underwear and digitally penetrated N.R.'s vagina.

86.    On or about October 9, 2021, Curiel met M.C. by the staff elevator at FMC Carswell and engaged in sexual intercourse with M.C.

87.    All of the sexual assaults took place near the staff elevator or the stairwell next to the elevator, both of which are within the boundaries of FMC Carswell.

88.    Curiel was sentenced to eighteen (18) months in federal prison, two (2) years of supervised release, and a special assessment of $200.

89.    He has a Federal Register Number of 01501-510.

90.    The criminal case associated with Curiel is 4:22-CR-132-P in the Northern District of Texas Fort Worth Division.

91.    The acts of Defendant Curiel violated Ms. Banda Martinez's constitutional rights, were wrongful as a matter of both federal and Texas law and were without justification under any applicable federal statute or rule.

92.    Defendant Curiel was acting within the course and scope of his employment at the time of the wrongful acts.

93.    Ms. Banda-Martinez suffered physical harm and severe mental anguish as a result of the terrifying sexual abuse she endured and the culture of rape existing at FMC Carswell that provided and opportunity for Defendant Curiel to sexually abuse her.

**IV.**
**CAUSES OF ACTION**

**Count One**
**Assault**
**Against Defendant Curiel**

94.    Ms. Banda-Martinez repeats and re-alleges each and every allegation contained in the above paragraphs, incorporates those allegations in this Count, and further alleges as follows:

95.    "Texas courts have recognized private causes of action for both assault and battery for well over a century." *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014). "

96.    The elements of Assault – Offensive Physical Contact are: 1) Defendant acted intentionally or knowingly; 2) Defendant made contact with the Plaintiff's person; 3) Defendant knew or reasonably should have believed that the Plaintiff would regard the contact as offensive

17

or provocative; and 4) Defendant's conduct caused injury to the Plaintiff. *City of Wautega v. Gordon*, 434 S.W.3d 586, 589-590 (Tex. 2014).

97.    Curiel, as described above, forcibly penetrated Ms. Banda-Martinez with his penis against her will and without her consent, and in doing so, intentionally or knowingly caused physical contact with Ms. Banda-Martinez, when Curiel knew or should reasonably have believed that Ms. Banda-Martinez would regard the contact as offensive or provocative because she did not consent to the contact.

98.    Curiel, as described above, forcibly stuck his fingers up her vagina against her will and without her consent, and in doing so, intentionally or knowingly caused physical contact with Ms. Banda-Martinez, when Curiel knew or should reasonably have believed that Ms. Banda-Martinez would regard the contact as offensive or provocative as she did not consent to the contact.

99.    There was no justification for Curiel's actions, as forced non-consensual sexual acts are never justified.

100.    These actions constitute the tort of Assault under the laws of the state of Texas.

101.    The forced sexual act injured Ms. Banda-Martinez because forced sexual acts caused severe mental trauma to those who are victimized as their free will is taken away in the most personal and private way.

102.    The injury would not have occurred had Defendant Curiel not forcibly penetrated Ms. Banda-Martinez with his penis and stuck his fingers up her vagina.

**Count Two**
**Battery**
**Against Defendant Curiel**

103.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

104.    A person commits a battery if he or she intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe the other person will regard the contact as offensive or provocative. *Wautega*, 434 S.W.3d 586 at 589-590.

105.    Curiel, as described above, forcibly penetrated Ms. Banda-Martinez with his penis against her will and without her consent, and in doing so, touched Ms. Banda-Martinez in an offensive manner.

106.    Curiel, as described above, forcibly stuck his fingers up Ms. Banda-Martinez' vagina against her will and without her consent, and in doing so, touched Ms. Banda-Martinez in an offensive manner.

107.    There was no justification for Curiel's actions.

108.    These actions constitute the tort of Battery under the laws of the state of Texas.

109.    Ms. Banda-Martinez repeats and re-alleges each and every allegation contained in

110.    As a result of Defendant Curiel forcibly penetrating Ms. Banda-Martinez with his penis and sticking his finger up her vagina, Plaintiff suffered physical harm, an invasion of her person, suffered and continues to suffer great emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem and self-worth, shame, and humiliation.

**Count Three**
**Federal Tort Claims Act (Negligent Retention and Supervision)**
**Against Defendant United States of America**

111.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

112.    Defendant United States of America was on notice that Defendant Curiel was unfit to supervise inmates including Plaintiff in this case but retained him and allowed him to continue to sexually assault inmates such as Plaintiff in this case.

19

**FMC Carswell Knew Defendant Curiel Posed a Danger to Inmates**

113.    On July 12, 2021, DOJ-OIG received information regarding an allegation of an inappropriate relationship between Curiel and female inmates.

114.    Specifically, a staff member reported that she witnessed an inmate inappropriately caressing Curiel in a sexual manner on his chest and shoulders as well as squeezing the muscles on his arm.

115.    The staff member observed this when she, Curiel, and Lieutenant Ricardo were responding to a medical emergency.

116.    The staff member first reported what she observed to Lieutenant Anthony. Lieutenant Anthony asked the staff member if anyone else saw this occur and if Curiel had said anything to her.

117.    Lieutenant Anthony told the staff member to leave the situation alone and to not tell anybody.

118.    The staff member and Lieutenant Anthony also spoke about Lieutenant Anthony's inappropriate behavior with inmate Jessica Mena as well as incident reports that the staff member had written about being taken out of the prison's computer system.

119.    The staff member reported that inmate Jessica Mena had said Lieutenant Anthony was her dad and that she had gotten special treatment because of this.

120.    Lieutenant Anthony apologized for inmate Jessica Mena calling him "daddy," apologized for incident reports going missing, and promised it would not happen again.

121.    The next day, the staff member was told to work an extra shift. At that time, the staff member saw Counselor Allen and informed Allen about the inmate inappropriately touching Curiel as well as the fact that Lieutenant Anthony had told her not to tell anyone.

122.    Counselor Allen told the staff member that she would need to write an email about what happened. Counsel Allen also told the staff member that she had told the Warden about what happened with the inmate and Curiel.

123.    The Warden and Assistant Warden came to the unit and spoke to Counselor Allen and the staff member.

124.    The Warden and Assistant Warden asked the staff member about how her unit was doing and did not address the inappropriate touching that the staff member had reported.

125.    After the staff member reported Defendant Curiel to administrators she was subsequently retaliated against and fired.

126.    The staff member reported Curiel to supervisors the summer of 2021.

127.    Yet, Curiel worked at the facility—and assaulted multiple women—after the reports were filed.

128.    The staff member informed the Star-Telegram that she never got a response to her initial report about Defendant Curiel.

129.    This means that despite having received information regarding allegations of inappropriate relationships between Curiel and female inmates Curiel was given access to vulnerable inmates such as Ms. Banda-Martinez.

### Defendant Curiel was Convicted of Sexual Abuse with a Ward

130.    Curiel admitted to what happened and eventually plead guilty to Sexual Abuse of a Ward in violation of 18 U.S.C. Section 2243(b).

131.    Shockingly, Curiel's abuse of power did not stop with the heinous sexual acts he committed against Ms. Banda- Martinez.

132.   Curiel also plead guilty to the sexual assault of M.C. and N.R. Like Ms. Banda-Martinez these were two female detainees also under the authority of Curiel.

133.   In October, Curiel met N.R. by the staff elevators at FMC Carswell and after kissing her neck, put his hand inside her pants and underwear and digitally penetrated N.R.'s vagina.

134.    On or about October 9, 2021, Curiel met M.C. by the staff elevator at FMC Carswell and engaged in sexual intercourse with M.C.

135.   All of the sexual assaults took place near the staff elevator or the stairwell next to the elevator, both of which are within the boundaries of FMC Carswell.

136.   Curiel was sentenced a total term of eighteen (18) months, two (2) years of supervised release in federal prison, and a special assessment of $200, and has a Federal Register Number of 01501-510.

137.   The criminal case associated with Curiel is 4:22-CR-132-P in the Northern District of Texas Fort Worth Division.

138.   The acts of Defendant Curiel violated Ms. Banda Martinez's constitutional rights, were wrongful as a matter of both federal and Texas law and were without justification under any applicable federal statute or rule.

139.   Defendant Curiel was acting within the course and scope of his employment at the time of the wrongful acts.

140.   Ms. Banda-Martinez suffered physical harm and severe mental anguish as a result of the terrifying sexual abuse she endured.

141.   Additionally, FMC Carswell has had multiple incidents with male staff sexually assaulting female inmates.

a. On 9/6/2017, Matthew McGaugh, a case manager at FMC Carswell, was sentenced to twelve months in federal prison following his guilty plea in July 2017 to Sexual Abuse of a Ward.

b. On 6/7/16, Yvonne Marrufo, a cook at FMC Carswell, plead guilty to Sexual Abuse of a Ward.

c. On 7/7/14, Brady Michael Green pleaded guilty to Providing a False Statement. According to his Factual Resume, he knowingly and willfully made a false statement by claiming to the Office of the Inspector General that he had sexual intercourse on one occasion with a female inmate of the BOP when the defendant then and there knew he had sexual intercourse with the inmate on more than one occasion.

d. On 11/14/07, Vincent Inametti, a chaplain at FMC Carswell, plead guilty to two counts of Sex Abuse of an Adult Ward in Custody. According to his Factual Resume, Mr. Inametti directed an inmate to the chapel library, where he engaged in a sexual act with that inmate. Mr. Inametti then summoned another inmate to a classroom in the chapel, where he engaged in a sexual act with that inmate.

e. On 2/10/04, a jury found Michael Miller, a guard at FMC Carswell, guilty of one count of Aggravated Sexual Abuse, one count of Sexual Abuse of a Ward, and two counts of Abusive Sexual Contact.

f. On 7/02/03, Dr. Carlos Baez, a staff obstetrician-gynecologist at FMC Carswell, plead guilty to Sexual Abuse of a Ward for having sexual intercourse with three prisoners.

g. On 5/7/99, Steven Suarez plead guilty to Sex Act with a Person Under Peripheral Supervision. According to the Order denying Defendant United States of America's Motion for Summary Judgement, prior to the final assault where Mr. Suarez forced the inmate to perform oral sex on him, the inmate had several private meetings with Mr. Suarez. In these private meetings, Mr. Suarez fondled her breasts, kissed and hugged her, and placed his hand on her vagina.

h. On 4/2/99, Larry Alex, a Kitchen Supervisor at FMC Carswell, plead guilty to Sexual Abuse of a Ward.

i. On 1/21/98, Gregory Morganfield, a guard at FMC Carswell, plead guilty to Sex Act with Prisoner by a Prison Guard.

j. On 5/14/97, Daryl Desjardin, a supervisory chaplain at FMC Carswell, plead guilty to Sex Act with Person Under Peripheral Supervision.

142. Based off the numerous prior sexual assaults by staff on inmates, BOP officials should have known better than to retain Defendant Curiel after receiving numerous inappropriate allegations made against him.

143. Additionally, Defendant United States of America should have implemented better hiring procedures to ensure that the onslaught of sexual assault by prison officials on inmates did not continue to happen over and over again, let alone in the exact same facility.

144. Defendant, United States of America, having a legal duty to Plaintiff, an inmate in its care and custody, breached that duty in that it negligently operated and managed FMC Carswell corrections facility by:

a. Hiring, retaining and entrusting Defendant Curiel who is, and was known or should have been known to defendants to be of such poor moral character, temperament,

and disposition as to be totally unfit to be hired and retained as a corrections officer and placed in charge of the Plaintiff.

b. Failing to adopt, incorporate, and enforce such rules, regulations, policies and procedures related to hiring, background screening, and selection process for employees and staff at the FMC Carswell corrections facility as would reasonably protect Plaintiff and others detained or incarcerated in the corrections facility from Defendant Curiel or other corrections facility employees.

c. Failing to adopt, incorporate, and enforce such rules, regulations, policies and procedures of the operation and management of the FMC Carswell corrections facility as would reasonably protect Plaintiff and others detained or incarcerated in the corrections facility from Defendant Curiel or other corrections facility employees.

d. Failing to properly supervise, investigate, and review the operation and management of the corrections facility and the activities and work performance of Defendant Curiel.

**The Discretionary Function Exception Does Not Bar Ms. Banda-Martinez's claims**

145. Section 2680 of the FTCA outlines exceptions that block the FTCA's waiver of the Government's sovereign immunity.

146. If an exception applies, a plaintiff's FTCA claim is barred, and a federal court is without subject matter jurisdiction over the claim.

147. Section 2680(a), commonly referred to as the "discretionary function," exception excepts any claim that is based upon a Government employee's performance of a "discretionary function or duty…whether or not the discretion involved be abused." Id; 28 U.S.C.A. Section 2680(a).

148.   Determining whether a particular governmental decision qualifies under the discretionary function exception is a two-step process. *Tonelli v. U.S.*, 60 F.3d 492, 496 (8th Cir. 1995)(see *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

149.   First, the Court must determine whether the challenged conduct involves the failure to follow a mandatory statute, rule or regulation. *Id*.

150.   If so, the discretionary function exception does not apply. *Id.*

151.   If the Court determines the conduct was discretionary, the Court must determine whether the challenged governmental decision involves the type of discretion that Congress intended to shield from liability. *Id*.

152.   Judgment calls which involve public policy considerations are immune from liability even if the government agent making a particular decision did not consciously consider policy factors. *Id*.

153.   In this case, the retention and supervision of Curiel were negligent acts, which Congress did not intend to shield the Government from liability though the discretionary function exception.

**Government employees were in violation of multiple federal policies and regulations by negligently retaining and supervising Curiel**

154.   First, the Government's employees violated federal regulations and BOP policy by negligently retaining and supervising Curiel.

155.   Second, even if the Court were to find that the decisions involved in retaining and supervising Curiel were discretionary, that discretion could not possibly have involved the kind of policy decisions that Congress intended to shield from liability.

156.   In 2003, Congress passed PREA for the intended purposes, *inter alia*, of establishing a zero-tolerance standard for the incidence of prison rape in prisons in the United

States, making the prevention of prison rape a top priority in every prison system, developing and implementing national standards for the detection, prevention, reduction, and punishment of prison rape, and increasing the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape. 34 U.S.C.A. § 30302(1-3, 6-7).

157. The PREA National Standards are codified in 28 CFR Ch. I, Pt. 115.

158. These standards provide federal regulations that must be followed by employees of the Bureau of Prisons (BOP). 28 C.F.R. § 115.5.

159. The BOP is mandated not to allow sexual abuse or sexual harassment in its facilities and PREA requires that "an agency shall have a written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment…" 28 C.F.R. § 115.11(a).

160. Additionally, PREA mandates that "the agency shall not hire or promote anyone who may have contact with inmates and shall not enlist the services of any contractor who may have contact with inmates, who — has engaged in sexual abuse in a prison…" 28 C.F.R. § 115.17(a)(1).

161. Furthermore, PREA mandates that "termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse." 28 C.F.R. § 115.76(b).

162. Finally, the U.S. Department of Justice Federal Bureau of Prisons Standards of Employee Conduct state that "An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate."[3]

163. Defendant violated each of these regulations and BOP policy in negligently retaining and supervising Curiel, after learning of his inappropriate sexual behavior, which lead to the sexual assault of Plaintiff.

---

[3] https://www.bop.gov/policy/progstat/3420_011.pdf.

164. A "zero tolerance" policy does not give any room for discretion.

165. When it came to the attention of DOJ-IIG that there were multiple inappropriate allegations made agaisnt Curiel, the appropriate response under a "zero tolerance" policy would have been termination.

166. It was clear that Curiel's supervisors were aware of the inappropriate allegations when a staff member reported Curiel to supervisors the summer of 2021.

167. Not only did retaining Curiel violate the "zero tolerance" policy of 28 C.F.R. Section 115.11(a), but it violated 28 C.F.R. Section115.76(b), since the presumptive penalty for the multiple inappropriate allegations against Curiel should have been termination.

168. Defendant's own Standards of Employee Conduct were also violated as Curiel's supervisors were not to "allow another person to engage in sexual behavior with an inmate."

169. However, by retaining Curiel, the Government was in fact ratifying his behavior to continue his sexual abuse of inmates.

170. As it is clear that Defendant United States of America violated multiple regulations mandated by Congress, as well as its own policy, the negligent retention and supervision cannot be said to be discretionary.

**The Government's conduct did not involve the kind of policy decisions that Congress intended to shield from liability**

171. Even if the Court is to determine that these acts are somehow discretionary, the analysis does not end.

172. Absent violations of mandatory federal regulations, issues of employee supervision and retention generally involve the permissible excuse of policy judgment and fall within the discretionary function; however, this is not always the case. *Tonelli* at 477; *Limone v. U.S.*, 336 F.Supp.2d 18 (D. Mass. 2004).

173.    The Court must look to the policy consideration to see if this is the type of discretion that Congress intended to shield from liability. *Id.*

174.    In *Tonelli*, the court addressed whether the discretionary function exception barred liability for claims of employee supervision and retention against the Postal Service when its employees were opening and copying first class mail, which constituted a federal crime. *Id.* at 495.

175.    The court found that while these issues are generally within the discretionary function exception, the action in that case involved allegations that the post office failed to act when it had notice of illegal behavior. *Tonelli*, 60 F.3d at 495-96.

176.    The court, in denying the discretionary function exception, held that failure to act after notice of illegal action does not represent a choice based on plausible policy considerations. *Id.* at 496.

177.    In *Limone*, the court addressed whether the discretionary function exception applied to claims of negligent retention and supervision. *Limone*, 336 F.Supp.2d at 39.

178.    In *Limone*, the plaintiffs alleged that FBI supervisors knowingly allowed (and at worst enabled) FBI agents to assist the Commonwealth's principal witness in providing false testimony and in working actively to obtain (and sustain) convictions against four innocent men, all to cover up a confidential informant's criminal activities. *Id.*

179.    Plaintiff also alleged FBI higher-ups, allegedly knowing the facts, even went so far as to recommend commendations for the FBI agents' activities in the investigation at issue. *Id.*

180.    The court, in denying the discretionary function exception, found that the case involved far more that the run-of-the-mill employment supervision decisions – it involved an intricate cover-up of illegal behavior made possible by FBI supervisors ignoring or at worst assisting in the illegal conduct of their subordinates. *Id.* at 41.

181. The court in *Limone* found that not only did the FBI supervisors violate several mandatory procedures, but that even if the Court found the supervisory decisions discretionary, that discretion could not possibly have involved the kind of policy decisions that Congress sought to protect. *Id*.

182. The court, quoting *Berkovitz*, stated, "The purpose of this exception is to 'prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id*. at 39; (quoting *Berkovitz*, 486 U.S. at 536–37).

183. The court went on to reference the holding in *Tonelli,* stating "Issues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception. However ... Failure to act after notice of illegal action does not represent a choice based on plausible policy considerations." *Id.* at 41; (quoting *Tonelli*, 60 F.3d at 496).

184. It is clear from these cases, that while issues of employee retention and supervision generally fall under the discretionary function exception, policy considerations do not always dictate that the exception applies.

185. Specifically, when there is prior knowledge of criminal conduct, supervisory discretion could not possibly have involved the kind of policy decisions that Congress sought to protect. *See Tonelli*, 60 F.3d at 496; *Limone*, 336 F.Supp.2d at 41.

186. In this case Defendant through Curiel's supervisors had prior knowledge of Curiel's criminal conduct involving sexual abuse of female inmates.

187. This prior knowledge of criminal conduct removes Plaintiff's claims from run-of-the-mil employment supervision decisions. *Limone*, 336 F.Supp.2d at 41.

188.    Additionally, like the cover-up in *Limone*, here, Lieutenant Anthony told the staff member to leave the situation alone and not tell anybody, after Lieutenant Anthony learned of Curiel's inappropriate behavior. *Id.*

189.    When looking to the policy considerations Congress sought to protect, the Court must look at reasons behind the relevant policies, which Congress has passed. Congress made the following findings, inter alia, regarding the passing of PREA, (3) "Inmates with mental illness are at increased risk of sexual victimization. America's jails and prisons house more mentally ill individuals than all of the Nation's psychiatric hospitals combined. As many as 16 percent of inmates in State prisons and jails, and 7 percent of Federal inmates, suffer from mental illness," (5) "Most prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults," (8) "Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released--as 600,000 inmates are each year," (11) "Victims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison. They are thus more likely to become homeless and/or require government assistance," and (13) "The high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution…" 34 U.S.C.A. § 30301(3), (5),(8),(11),(13).

190.    When looking at these findings in conjunction with the purposes of enacting PREA enumerated in 34 U.S.C.A. § 30302, *supra*, it is clear that Congress did not intend to shield from liability the Governmental conduct in this case: retaining a government employee in a the role of a case manager dealing with vulnerable victims in the mental health unit, and allowing that government employee to have access to vulnerable victims in spite of the fact that the Government had prior knowledge of sexual abuse allegations against that government employee.

191.    This conduct is contradictory to everything Congress stated as the reasons for and purposes of PREA.

192.    If this is not the type of conduct that Congress did not intend to shield from liability, it is unclear what would be.

193.    It begs the question, how many times will female inmates need to be sexually assaulted by Defendant's employees at the Carswell facility before policy considerations and Defendant's knowledge and negligence allow justice to be done – 20, 50, 100?

194.    The number has already reached double digits, Defendant was aware of that fact as well as the fact that there were prior incidents involving Curiel, yet still negligently retained and supervised him by allowing him access to the most vulnerable population in the prison.

195.    Congress did not intend for this conduct to be shielded from liability.

196.    For the reasons stated above, the discretionary function exception does not bar liability for Plaintiff's claims in this case.

197.    The Government violated federal regulations by negligently retaining and supervising Curiel and thus the conduct was not discretionary.

198.    However, even if the Court were to find that the decisions involved in retaining and supervising Curiel were discretionary, based off *Tonelli*, *Limone*, and the findings and purposes of PREA, that discretion could not possibly have included the kind of policy decisions that Congress intended to shield from liability.

199.    The negligence of Defendant United States of America was wrongful as a tort under the laws of Texas and of the United States and without justification under any applicable state or federal statute or rule.

200.   As a result of the rape by Defendant Curiel, Plaintiff suffered and continues to suffer great emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem, and self-worth, shame, and humiliation.

201.   Plaintiff seeks compensatory damages and costs against Defendant United States of America.

## V.
## DAMAGES

202.   Ms. Banda-Martinez repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

203.   Ms. Banda-Martinez's injuries were a foreseeable event.

204.   Those injuries were directly and proximately caused by Defendants' actions and inactions. As a result, Plaintiff is entitled to recover all actual damages allowed by law.

205.   Additionally, Ms. Banda-Martinez contends the Defendant's conduct constitutes malice, evil intent, or reckless or callous indifference to her constitutionally protected rights; thus, she is entitled to punitive damages against Defendant Curiel.

206.   As a direct and proximate result of the occurrence which made the basis of this lawsuit, Ms. Banda Martinez was forced to suffer:

   a.   Physical harm;
   b.   Physical pain and suffering;
   c.   Emotional distress, torment, and mental anguish in the past and future, and
   d.   Medical and mental health expenses.

## VI.
## ATTORNEY'S FEES

207.   If Ms. Banda-Martinez prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 28 USC § 2678.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Betzabel Banda-Martinez, prays that judgment be rendered against Defendants United States of America and Luis Curiel, for an amount in excess of the jurisdictional minimum of this Court. Ms. Banda-Martinez further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

Respectfully submitted,

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@palmerperlstein.com
breanta@palmerperlstein.com
scott@palmerperlstein.com

**ATTORNEYS FOR PLAINTIFF**
**BETZABEL BANDA-MARTINEZ**